## NORRIS v. SHOWERMAN & CHURCH.

The object of interpretation is to ascertain the intention of the parties.

Such intention should be gathered from a consideration of all the parts of an agreement, and one clause should be interpreted by another.

The situation of the parties, and the subject matter of the transactions to which the contract relates, may be taken into consideration in determining the meaning of any particular sentence or provision.

Water was leased by the following words, viz: " *The right and privilege of drawing from the west side of the race now making by the said party of the first part, in Ypsilanti aforesaid, and leading to his new saw mill, at any place within sixteen rods from the head gate of said race, as much water as will run through an aperture of two feet square, under a head of four feet from the top of said aperture, for the use of carrying machinery for iron works, provided so much shall be needed by the said party of the second part for such use :*" And the lease further provided as follows: " *That in case the two feet square of water should not be enough for the use of such iron works as the said party of the second part may hereafter erect, near said race, he shall have as much more as shall be necessary for such use, by paying therefor at the same rate as for the two feet square aforesaid;*" and also, " *That in case a sufficient quantity of ore cannot conveniently be procured for carrying on said iron works to advantage, the said two feet square of water may be used for such other machinery as the said party of the second part shall think fit and proper.*"   Held, that construing the words of demise by the other parts of the instrument, the lessee was entitled to as much water as would run from the race, into a flume conducting it to the iron works, through an aperture two feet square, made in the side of the race, not lower down than four feet below the surface of the water in the race; and not to as much water as would flow through an aperture of the size and under the head mentioned, into open space, or directly upon the wheel where it was applied.

Held, also, that the correctness of this construction was made more manifest by a consideration of the extrinsic fact that ten-sixteenths of the whole volume of the river, or sufficient water to propel six or seven run of stones in a grist mill, would pass into open space, through an aperture of the size and under the head mentioned.

Held, further, that on the hearing, on a bill filed to obtain an admeasurement of water under the lease, such extrinsic fact, though not alleged in the bill, might be given in evidence for the purpose of showing the intention of the parties to the instrument.

Norris *v.* Showerman.

After the execution of a lease of as much water as would flow through an aperture of a certain size, to be taken from the side of a race, the parties agreed *by parol* that the water should be taken from the dam, instead of the race; and that, in accordance with what was the original understanding, though ambiguously expressed in the lease, the water should be measured at the head gates.   While the whole agreement rested in parol merely, but after that part of it which related to the place from which the water should be taken, had been executed, the lessee agreed to assign the lease to a third person, who thereupon entered into possession and continued to take the water from the dam.   Before any written assignment was executed, however, the following memorandum—"*It is further agreed that the water is to be measured at the head gates*"—was added to the lease and signed and sealed by the lessee.   *Held,* that the partial execution, by taking the water from the dam, of the agreement varying the terms of the lease, took the whole agreement out of the statute of frauds.

*Held,* also, that in equity, that is notice of a fact, which is sufficient to put the parties on inquiry; and that the fact, that, at the time of his contract to assign the lease, the lessee was in possession, taking the water from the dam instead of the race, in accordance with a part of the agreement varying the terms of the lease, was notice to his assignee of the whole agreement, and he was therefore bound by it.

APPEAL from Chancery.   *( Vide* S. C. reported 1 Walk. Ch. R. 206.)

The bill in this case was filed by Norris to obtain an admeasurement of water, under a lease executed by him to one A. M. Hurd, and alleged that the defendants were joint owners, by assignment, of the entire leasehold interest.   The defendant, Showerman, put in an answer, from which it appeared that Church, his co-defendant, had assigned to him a long time before the bill was filed, and that he thereupon became and was the sole owner of the leasehold interest.   Church having, therefore, no interest in the suit, suffered the bill to be taken as confessed against him.

The lease was in the following words:

"Article of agreement made and entered into this ninth day of June, in the year of our Lord one thousand eight hundred and thirty-two, between Mark Norris, of Ypsilanti, county of Washtenaw, and territory of Michigan, of the first part, and Alanson M. Hurd, of Detroit, in the territo-

ry aforesaid, of the second part, witnesseth; That the said party of the first part, for and in consideration of the covenants and agreements herein after contained, to be performed and kept by the said party of the second part, doth hereby grant and convey to the said party of the second part, and to his heirs, for fifty years, and the privilege of renewing this agreement for fifty years more, at the end of this term, the right and privilege of drawing from the west side of a race, now making by the said party of the first part, in Ypsilanti aforesaid, and leading to his new saw mill, at any place within sixteen rods from the head gate of said race, as much water as will run through an aperture of two feet square, under a head of four feet from the top of said aperture, for the use of carrying machinery for iron works, provided so much shall be needed by the said party of the second part for such use, and also the right of erecting a bridge across said race, and using the same.    In consideration whereof, the said party of the second part hereby agrees to pay to the said party of the first part the sum of fifty dollars per year, payable annually, on the ninth day of June, for the payment of which sum, the said party of the second part hereby binds himself, his heirs, executors and administrators."

"It is hereby further agreed by and between the parties aforesaid, that in case two feet square of water should not be enough for the use of such iron works, as the said party of the second part may hereafter erect near said race, that he shall have as much more as may be necessary for such use, by paying therefor, at the same rate as for the two feet square aforesaid.    It is further agreed that in case a sufficient quantity of ore cannot conveniently be procured for carrying on said iron works to advantage, that the said two feet square of water may be used for such other machinery as the said party of the second part shall think fit and proper.

Norris *v.* Showerman.

" In witness whereof, the said parties hereunto set their hands and seals, the day and year first above written.

" In presence of    }      *Mark Norris*, [L. S.]
" *E. M. Skinner.* }      *A. M. Hurd*, [L. S.]"

The race mentioned in the lease extended seventy or eighty rods below a dam on Huron river, owned by Norris, and drew water from the pond to supply the saw mill mentioned in the lease, and also a flouring mill about seventy rods below the dam, owned also by Norris, and erected in 1838.

Soon after the lease was executed, and as early as the fall of 1832, it was agreed verbally between Norris and Hurd, that the water leased, instead of being taken from the side of the race, as provided in the lease, should be taken, by a flume, directly from the pond; and on the erection of the iron works, such a flume was constructed, through which the water was taken by Hurd, and continued to be taken by those who successively became owners, by assignment, of the leasehold interest, until the time of the filing of the bill. It was also agreed, at the same time, that the water should be measured at the head gates, and that this should be added to the lease: Accordingly, Hurd afterwards made the following memorandum at the foot of it.

" It is further agreed that the water is to be measured at the head gates.

" Witness present,    }      *A. M. Hurd*, [L. S.]"
" *E. M. Skinner.* }

In February, 1833, Hurd agreed to sell one half of the leasehold interest to one Morris Sage, who soon afterwards entered into possession; but it did not appear that the agreement between the parties was reduced to writing until about a year after it was made. And, in December, 1833, Hurd also agreed with James M. Edmunds and Abel Godard, to sell them the other half of the leasehold

interest, and they thereupon entered into possession with Sage, and Hurd's possession terminated. The contract with them, although in writing, was made, on the part of Hurd, by his father as his agent, and it did not appear that he acted under any written authority.

As to whether, at the time when these parties (and especially Sage,) purchased of Hurd, the memorandum signed by him was at the foot of the lease, there was much conflict in the testimony. In the view taken by the court this was immaterial.

The lease, with the memorandum at the foot of it, was recorded June 26, 1834, and on the 22d day of May, 1835, Hurd executed a formal assignment of one half of the leasehold interest to Sage, and also a like assignment of the other half to Edmunds, Godard, and one Allen Stewart, in consummation of the above mentioned agreements; both assignments referring to the lease as recorded. There was testimony going to show that Norris knew of these transfers by Hurd, and acquiesced in them.

Showerman, whose title was derived through these assignees of Hurd, on coming into possession of the leasehold interest, insisted that the memorandum added to the lease, was made by Hurd without authority, after he had parted with the leasehold interest, and therefore constituted no part of the instrument, and he was not bound by it; and he claimed such definite quantity of water, ascertainable by calculation, as would flow through an aperture of the size and under the head mentioned in the lease, into open space, or directly upon the wheels of the machinery to be propelled by it:—in other words, that he was entitled to a definite quantity of water independent of the mode of taking it, and might have it measured by an aperture placed under the proper head wherever he chose.

Norris, on the other hand, insisted that the memoran-

dum was a part of the lease, and binding upon all persons claiming rights under it; and that even if it was not, the proper construction of the lease itself required that the water should be measured by an aperture, of the size and under the head mentioned, placed in a head gate at the side of the race, or in the dam from which the water was taken by a flume to the iron works, and that Showerman was entitled only to so much water as would pass through such aperture so situated.

Showerman, using, and insisting upon his right to use, more water than he would be entitled to under this latter construction, in December, 1838, Norris gave him notice to attend and assist in putting in a head gate, for the purpose of measuring the water. He refused to attend, and thereupon Norris put into the dam a head gate with an aperture two feet square in it, for the water to pass through from the mill pond into the flume, which head gate Showerman soon afterwards removed. And again, in May, 1839, Showerman still refusing to assist, Norris caused a new head gate, with an aperture as aforesaid, to be fitted into the same place, which Showerman likewise removed.

Whereupon, Norris filed the bill in this case, setting forth the facts, and praying that Showerman might be required, under the direction of the court, or of some one to be appointed for that purpose, to replace the head gate so removed, and that he be enjoined from afterwards removing it.

There was much evidence in the case as to the measurement of the water, and of extrinsic facts throwing light upon the intention of the parties to the lease. Such of it as the view taken by the court renders material, sufficiently appears in the opinion.

On the hearing, the chancellor granted a decree in accordance with the prayer of the bill. From this decree Showerman appealed to this court.

*James Kingsley* and *H. T. Backus,* for complainants, contended :—

1. That the court of chancery had jurisdiction to grant the relief prayed for. *Belknap* v. *Trimble,* 3 Paige, 577 ; *Arthur* v. *Case,* 1 Id. 448; *Robinson* v. *Lord Byron,* 1 Brown's Ch. R. 588 ; *Lane* v. *Newdigate,* 10 Ves. 192.

2. If Hurd had never assigned his interest in the lease, and the present controversy was with him, he would certainly be bound by the memorandum at the foot of it. As the defendants claim through him, they are likewise bound by it, for the following reasons :—(1.) The lease or agreement not being in its own terms assignable, (running to Hurd and his heirs, not *assigns,*) Hurd's assignees, even after a formal written assignment, acquired but a mere equity; *Thompson* v. *Rose,* 8 Cow. 263, 266 ; *Spencer's case,* 5 Co. 17 ; 6 Cow. 302 ; and took it subject to all equities between the original parties; *Murray* v. *Lilburn,* 2 John. Ch. R. 441 ; *Livingston* v. *Dean,* Id. 479 ; *Norton* v. *Rose,* 2 Wash. C. C. R. 233 ; *Picket* v. *Norris,* 2 Id. 255; and would be concluded by the acts *in pais* of the assignor, or by a legal decision against him. *Curtis* v. *Cisna's Adm.* 1 Ham. R. 436 ; *Grey* v. *Cuthbertson,* 2 Chit. R. 482.—(2.) Hurd's immediate assignees, under whom Showerman claims, had full legal notice of the rights of the complainant under the agreement of Hurd, by virtue of which the memorandum was placed at the foot of the lease. When they contracted to purchase, the water was taken from the pond, instead of the race, by virtue of a part of the same agreement. This was notice to them of the whole agreement; *Smith* v. *Low,* 1 Atk. 490 ; *Mertins* v. *Joliffe,* Ambl. 313 ; *Daniels* v. *Davison,* 16 Ves. 250; Fonbl. Eq. 416 ; *Green* v. *Slayter,* 4 John. Ch. R. 46 ; 12 John. 343 ; 17 Ves. 433 ; *Sandford* v. *Manning,* 6 Paige, 383; and they would have been bound by it, even if the memorandum had not been made until after actual assignment.—

(3.) Under the statute of frauds, Hurd's assignees could acquire no legal interest in the lease until actual assignment in writing.  R. L. 1833, p. 342 ; *Mumford* v. *Whitney*, 15 Wend. 380 ;  *Thompson* v. *Gregory*, 4 John. R. 81 ; *Jackson* v. *Buel*, 9 Id. 298.  As the memorandum was in fact made before the execution by Hurd, of any written assignment, Showerman must be bound by it.—(4.) Had it even been made afterwards, then the equities of the parties would have been equal, and neither party having the legal title, the prior equity should prevail ; *Grimstone* v. *Carter*, 3 Paige, 421 ; and, the agreement to take the water from the dam, and to have it measured at the head gate, being prior to interest or claim by Showerman, or by any of Hurd's assignees, the complainant would be entitled to have it carried into effect; for, the maxim of equity as well as law is, *qui prior est tempore potior est jure.* *Berry* v. *Mutual Ins. Co.* 2 John. Ch. R. 608.

3. But the true construction of the lease, independently of the memorandum, would require that the water should be measured at the head gates.

In the construction of instruments the intent of the parties is to control; *Quick* v. *Stuyvesant*, 2 Paige, 92 ; Kames on Eq. 80, 81, 99 ; 8 Cow. 32 ; 4 Conn. R. 10 ; 1 Burr. 285 ; *Howell* v. *Richards*, 11 East, 642 ; *Bull* v. *Follet*, 5 Cow. 178; *Marvin* v. *Stone*, 2 Id. 781 ; 2 Id. 195; Chit. on Contr. 19.  And, in ascertaining the intent, the situation of the parties and of the subject matter is to be considered.  *Wilson* v. *Troup*, 2 Cow. 195.  Now, looking at the purposes to which the water was to be applied, as expressed in the instrument,—the provision for an increase of the quantity, in case it was needed,—the price which was to be paid for it,—the fact that the complainant had other mills supplied from the same dam,—the very large quantity of water, and the proportion of the whole power, which would be taken under the construction claimed by

the defendants,—can there be a doubt that it was the intention of the parties that the water should be measured in the ordinary way, by an aperture in the head gate, and not upon the abstract principles of spouting fluids?

*C. W. Lane* and *Wm. A. Fletcher*, for defendants.

GOODWIN, J. delivered the opinion of the court.

I have examined with much care *the various* questions presented by the case upon the pleadings and testimony and will proceed to state the conclusion at which I have arrived.

The principal questions are, 1. What is the construction of the instrument executed by complainant, granting the water power to Hurd, without the addition made to it? 2. What with that addition? and, 3. If the addition varies the construction of the original instrument, is it, in respect to the defendant, a subsisting and valid part of it?

The defendant, Showerman, insists that, by the terms of the lease, the water granted to the lessee was to be measured, not by an aperture to be inserted in a gate at the race or dam, from which it was to be transferred to the iron works of the lessee, but that it should be measured, as stated in his answer, on the wheel; that the words in the lease, "as much water as will run through an aperture of two feet square, under a head of four feet from the top of said aperture," contemplate the quantity of water, ascertainable by calculation, which will flow through an aperture of the size mentioned, under the pressure of the head mentioned, into open space, without the obstruction of any flume or channel conducting it to the machinery to be propelled by it; that he has the right to that definite quantity of water, to be applied on the wheels of the machinery;—in other words, that he is entitled to a definite quantity of water, independent of the mode of taking

it.  On the other hand, it is contended on the part of the complainant, that, by the terms of the lease, the water granted is to be drawn in a particular manner, through an aperture of the size mentioned, from under the given head in a gate at the race mentioned in the lease, or the dam from which the flume was made to the iron works; and that the defendant, by the true construction of the lease, is entitled only to the volume of water which will, in this mode, pass through the given aperture.

The first question which presents itself, is, which of these two constructions of the lease is the true one.  The great end in construing instruments is to ascertain what was the actual intention of the parties, and it is the object of courts of law and equity to enforce them according to such intention.  To ascertain the true meaning and intention of the parties, it has been long a well settled rule, that the whole instrument is to be examined, and every part taken into consideration.  As was said by Chief Justice *Hobart,* in the case cited by Lord *Ellenborough,* in *Howell* v. *Richards,* 11 East, 643, "Every deed is to be construed according to the intention of the parties, and the intents ought to be adjudged of the several parts of the deed, as a general issue out of the evidence: and the intent ought to be picked out of every part, and not out of one word only."  This general principle is found in all cases on this subject, ancient and modern, and the soundness of the rule I think cannot be questioned.

It is also a further well settled rule, that in the construction of contracts, the situation of the parties, and the subject matter of their transactions to which the contract relates, may be taken into consideration in determining the meaning of any particular sentence or provision. *Wilson* v. *Troup,* 2 Cow. 228.

Let us apply these principles to the construction of the instrument under consideration.  The complainant was in

possession, claiming title to, and recognized by the lessee as the owner of, a dam or water power on the river Huron, at Ypsilanti. He had erected a saw mill some seventy or eighty rods below, and was making a race from the dam, along the vicinity of the river, on the east side, to the saw mill. The lessee contemplated erecting, or was erecting, iron works, a little below the dam, between the race and the river. And in reference to these facts, all of which that are material, appear from the instrument, the lease is made, by which the lessor grants "The right and privilege of drawing from the west side of a race now making by the party of the first part, in Ypsilanti aforesaid, and leading to his new saw mill, at any place within sixteen rods from the head gate of said race, as much water as will run through an aperture of two feet square, under a head of four feet from the top of said aperture." If the grant had stopped here, and there were nothing more of it, probably the defendant's construction would be the correct one; but it proceeds, "for the use of carrying machinery for iron works, *provided, so much shall be needed by the party of the second part for such use.*" Here, in the sentence specifying the thing granted, is one restriction, which would have been operative had iron ore been found to carry on the contemplated works. The instrument proceeds, and after providing for a rent of fifty dollars per annum, contains a further agreement, *that in case two feet square of water should not be enough* for the use of such iron works as the said party of the second part may hereafter erect near said race, that he shall have as much more as may be necessary therefor, at the same rate *as for the two feet square aforesaid,*" and further, that "in case a sufficient quantity of ore cannot be conveniently procured for carrying on said iron works to advantage, *that the said two feet square of water may be used* for such other machinery," &c. It seems to me that these provisions are the descrip-

tion of the grant by the lease, and mean a volume of two feet square, to emanate from the race, under the pressure of four feet head, and to be thence conducted to the iron works, and thus qualify the previous general words. This view certainly derives force from the fact that one of the clauses supposes that the quantity granted might not be sufficient for the proposed iron works.

When we take into consideration the quantity of water the defendant would have by his mode of interpreting the grant, (one of the witnesses stating that it would take ten-sixteenths of the whole, and the others, generally, that it would give enough to carry six or seven run of mill stones in a grist mill,) we can hardly presume the parties intended that such a quantity should be drawn from the side of complainant's race, which he was making to conduct the water to his own mill. The whole language, however, taken together, seems to me to indicate the other construction.

As to the evidence tending to show the large quantity of water defendant's interpretation would give, it is insisted by the counsel for defendant, that the fact is not averred in the bill and made the ground of relief, and that the evidence is therefore irrelevant. This position would undoubtedly be correct if it were made a ground of relief on the score of mistake, or other equitable consideration. But here it is introduced to show the situation of the subject matter to which the contract refers, and the consequent effect of one of the two different constructions contended for.

When the addition to the lease,—"it is further agreed that the water is to be measured at the head gates,"—is taken in connection with it, the construction above regarded as the correct one, is still more apparent; though, from the construction which appears to me to be the correct one of the original lease, this is unimportant. It is contended

that the addition to the lease was made after the purchase by Sage, and Edmunds and Godard, and that they had no notice of any modification of the agreement at the time of their purchase. As to the time when the addition was made, the evidence is somewhat conflicting. The chancellor, in his decision, deems this immaterial, on the ground that neither having the legal title, the older equity should prevail. This is doubtless a correct principle, and applicable, unless the earlier agreement, that with Sage, were void under the statute of frauds. The agreement with Sage does not appear, from the evidence, to have been reduced to writing at the time it was made, or until a bond was given in February, 1834. That with Edmunds and Godard, it appears, was; but, it was made and signed on the part of Hurd, by his father, as his agent, though, whether his authority was in writing does not appear. It appears from the evidence of A. M. Hurd and Philo Hurd, that soon after the making of the original lease, and as early as in the fall of 1832, a further verbal agreement was made, modifying the original lease, by which the water was to be taken from the pond instead of the race, and that it was then agreed that the water should be measured at the head gates, and that this should be added to the lease. Whether this latter addition was to be made in consequence of a supposed ambiguity, or an omission, does not distinctly appear, though Hurd states that it was the original understanding that the water should be measured where it was drawn from the race. Under this modification, a flume was constructed, conducting the water from the dam to the iron works, which flume continued until after Hurd's sale and transfer, and indeed ever since,—the premises having been in this manner occupied and enjoyed by all the successive assignees, the defendant included, down to the time of filing the bill. Here, then, was a parol agreement, undoubtedly after the original lease was made, part-

Norris v. Showerman.

ly executed; and so far executed, it appears to me, as to take it out of the statute of frauds. And the part of the agreement relative to the change of location yet rests in parol. The defendants do not, it is worthy of remark, seek to avoid this part of it, but acquiesce in the change of location which the complainant sets up, while they seek to avoid that part which was afterwards added to the lease. When Hurd's assignees purchased of him, there was the possession under the modification of the lease, which was notice to them of the modification; for, in equity, that is notice of a fact, which is sufficient to put a party on inquiry. And here, when Hurd's assignees purchased, finding the location variant from the lease, and upon Norris' premises, drawing the water from his pond, upon inquiry of him, they would have learned the agreement under which the change was made, and if the place of measurement were an alteration, of course they would have heard of that also. Notice of a part of the agreement under which Hurd held and occupied, must be deemed notice of the whole of it. It may be remarked, also, that it appears from A. M. Hurd's testimony, that Sage, at the time of the agreement with him for a sale, had actual notice. If, then, the addition to the lease made a change of its terms as to the measurement of the water, and varied the proper construction and effect of the original lease, I could not, I think, avoid coming to the conclusion that, at the time of the purchase, by the defendant's assignors, of Hurd, the agreement, having been thus far performed, was valid in equity; that they, even if they had, at the time of their purchase, acquired a full assignment, should be deemed purchasers with notice; and that the modification of the agreement was obligatory upon them; and, consequently, that even if the construction which I give to the original lease, be not the true one, yet, that with the addition em-

braced, it is so; and that the conclusion of the chancellor is therefore correct.

It is said that the chancellor should, by his decree, have enjoined the defendant from using an excess of water, instead of directing the gates and aperture guaged and inserted. But I think the decree in this respect unobjectionable, and sanctioned by the case of *Arthur* v. *Case*, 1 Paige, 448, on the authority of *Martin* v. *Sherman*, Mosely, 144.

The defendant's counsel also complains that, by the decree, the gates and aperture, &c. are required to be put in at the defendant's expense. I see nothing wrong in this. *He*, under the agreement, must draw the water from the pond, for his own benefit, and of course at his own expense. He was requested to put in gates and take only the water that was his under it. According to the construction we deem the true one, he was taking more. He should have complied with the request. That it should be done under the direction of a master was rendered necessary by his course.

The case is of a novel character in our courts, and has been argued with much zeal and ability. After full and careful consideration of the questions presented, I have come to the conclusion that the decree of the chancellor must be affirmed. And such is the opinion of the court.

*Decree affirmed.*