BYRNE *v.* WERNER.[1]

VENDOR AND PURCHASER — CONVEYANCE OF PARTIALLY CONSTRUCTED BUILDING—BUILDING MATERIALS—PASSING OF TITLE.
  Cut stone and structural iron belonging to the owner of a partially completed building, secured by him for use in the building, and lying on the lot on which the building stood and on an adjoining one, passed by the owner's warranty deed of the lot on which the building stood. MOORE, C. J., and HOOKER, J., dissenting.

---

[1] Rehearing denied January 30, 1905.

Error to Marquette; Stone, J. Submitted April 7, 1904. (Docket No. 20.) Decided December 7, 1904.

Trover by Samuel E. Byrne, Jr., against Jacob P. Werner and another for the alleged conversion of certain building material. There was judgment for plaintiff, and defendants bring error. Reversed.

*Ball & Ball*, for appellants.

*Button & Culver*, for appellee.

CARPENTER, J. Plaintiff brings this suit to recover for the conversion of certain cut stone and structural iron. The property originally belonged to plaintiff's father, Samuel E. Byrne. Both parties claim to have acquired his title. Plaintiff claims to have acquired it by a bill of sale executed in 1896. It is defendants' claim that in 1887 the property in controversy was transferred by Samuel E. Byrne to Henry C. Thurber, and that they have acquired Thurber's rights. It is clear that defendants have acquired the rights of Thurber, and that, therefore, the validity of their claim depends upon whether Byrne transferred the property to Thurber. The facts respecting the transfer are as follows:

In 1887 Byrne conveyed to Thurber by a warranty deed (intended to be a mortgage) lots 4 and 5 of block 17 in the city of Marquette. At that time there was situated upon these lots a partially completed building in the process of erection. There was also situated on the land conveyed and on an adjoining lot the cut stone and structural iron involved in this case, which was intended to be used in the completion of the building. The stone had been cut and dressed for the front of the building. Each piece of the structural iron was of the dimensions provided in the plan of the building, and fit for the place where it was to go. At that time it was intended that the building would be completed. The plan of completing the building was,

for some reason, abandoned, and defendants used the stone and iron for another purpose.

Did the title to that material pass to Thurber by his deed ? The learned trial judge held that it did not. It is urged that the building material had not become a part of the land, and was, therefore, in a legal sense, personalty at the time of the conveyance to Thurber. If this be true, it is not, in my judgment, decisive of this controversy. Though the building material was personalty, it is our duty to declare that it passed with the partially completed building, if the parties so intended, and if that intent may be ascertained from a proper construction of the conveyance of the land upon which said building stood. The question is, then, not whether the building material was in fact personalty, but whether it was intended to transfer it with the conveyance of the partially completed building. And this intent is to be determined by a proper construction of the conveyance; that is (see *Norris* v. *Showerman*, 2 Doug. 16; *Davis* v. *Belford*, 70 Mich. 120), by applying the language of the conveyance to its subject-matter. No uncertainty results from this rule. Upon the land conveyed to Thurber was an incomplete building in the process of erection. Situated upon that land and upon the adjoining land was building material designed to be used for the completion of the building. It was surely intended that the incomplete building should be transferred to Thurber. It was surely intended that the building would be speedily completed with the building material at hand. And I think it therefore equally certain that it was intended that such material should pass with the conveyance. In my judgment, there is no sound principle of law which compels us to defeat this intention. On the contrary, I maintain that it is our clear legal duty to give it effect. I think, therefore, that the building material became the property of Thurber. This conclusion is sustained by authority.

In *Wistow's Case of Gray's Inn*, (14 Hen. VIII.) 11 Coke, 50*b*, it was resolved that a millstone temporarily

severed from the mill, with the intention that it should be replaced, passed with the conveyance of the mill. "So of doors, windows, rings, etc. The same law of keys, although they are distinct things, yet they shall pass with the house."

In *Conklin* v. *Parsons*, 1 Chand. (Wis.) 240, it was held that rails placed along the boundary line, "not laid up into a fence, but which had been placed on the land for the purpose of building the fence," passed with the conveyance of the land.

In *Ripley* v. *Paige*, 12 Vt. 353, there was a controversy as to whether certain rails passed with the conveyance of land from plaintiff to defendant. Defendant offered to prove that when the conveyance was made the rails were distributed upon the farm for the purpose of being there erected into a fence. The court said:

"Upon this branch of the case we are inclined to regard the rails, if it was evident from the manner of their distribution upon the land, and other appearances, that they were designed for immediate use in fencing the land, as we should the materials of a fence accidentally fallen down, or of one purposely taken down to be immediately reconstructed, or those of an intended wall distributed in like manner. As fences always pass by a deed of the soil on which they stand if the grantor has an unrestricted right to convey both, so we are disposed to think that such materials for a fence may, in all these cases, as against the grantor, be treated as being within the operation of his deed."

In *Hackett* v. *Amsden*, 57 Vt. 432, it was held that stone posts, which it seems were deposited on a farm for the purpose and with the intention of building necessary fences, could not be seized and sold as personalty; the court saying:

"Whatever the rule may be elsewhere, it seems to be settled in this State that suitable materials, deposited upon a farm for the purpose and with the intention of building necessary fences with them thereon, pass by a conveyance of the land as a part of the realty."

In *Wadleigh* v. *Janvrin*, 41 N. H. 503, it was held that certain stanchion timbers, staples, tie chains, and planks, which had been removed from a barn for the purpose of making repairs, passed to plaintiff by a conveyance from defendant of the land upon which the barn stood, notwithstanding the fact that the latter had formed a plan unknown to the former to make changes in the barn and to dispense with their use. The court said:

"It was entirely immaterial what purpose the defendant had formed, so long as he had not carried it out. By the conveyance the barn passed to the plaintiff just as it then was, with portions afterwards carried off by the defendant dissevered from the rest. The plaintiff saw the barn in the process of repair. He had a right to infer, and to act upon the inference, that the dissevered portions constituted an integral portion of the edifice."

In *Palmer* v. *Forbes*, 23 Ill. 301, it was held that the title to rolling stock and the material provided for the repair of tracks was transferred by a mortgage of the real estate of a railroad company; the court saying:

"It is a familiar principle to all that rails hauled onto the land designed to be laid into a fence, or timber for a building, although not yet raised, but lying around loose and in no way attached to the soil, are treated as a part of the realty, and pass with the land as appurtenances."

This decision and reasoning go farther than it is necessary for us to go in the case at bar.

In *McLaughlin* v. *Johnson*, 46 Ill. 163, it was held that rails which had once been and which were intended to again be used for a fence passed with the conveyance of the land notwithstanding the fact that at the time of such conveyance they were actually in temporary use on adjoining land. See, also, *Curtis* v. *Leasia*, 78 Mich. 480.

*Harris* v. *Scovel*, 85 Mich. 32, is not inconsistent with these views. There it was held that rails piled on land did not pass with its conveyance. The rails had once formed part of a fence. The grantor had taken down the fence because it was no longer needed, intending to use

the rails elsewhere. It is clear that there was no ground upon which the grantee could assert that it was intended that the rails should pass with the land.

*Johnson* v. *Mehaffey*, 43 Pa. St. 308, relied upon by plaintiff and the learned trial judge, is, in my judgment, clearly distinguishable from the case at bar. In that case it was held that rolls originally purchased to be put in a mill did not pass upon a conveyance of the mill. At the time of the sale these rolls had for nearly three years remained on the property, unused, and in a rough, unfinished state. They were not necessary to the operation of the mill, for the mill had always run without them. This afforded a ground for saying that it was not intended that the rolls should pass to the purchaser of the mill. That gound does not exist in this case, for the building material in question was necessary for the completion of the building.

*Woodman* v. *Pease*, 17 N. H. 282, cited by plaintiff, is very similar to *Johnson* v. *Mehaffey*, supra, and is likewise distinguishable from the case at bar. It is true that the court in deciding each of these cases stated that personalty does not become a part of real estate until actually annexed thereto. If by this it was intended to assert that, notwithstanding the obvious intent of the parties, property originally personalty, will not, unless actually annexed thereto, pass on a conveyance of real estate, the court made a statement not necessary to its decision—which might have rested upon the intention of the parties concerned—and which, as already indicated, I cannot approve. Other cases cited by plaintiff are even more easily distinguishable.

In *Cook* v. *Whiting*, 16 Ill. 480, it was held that the "simple intention" of the vendor, before he sold his farm, to erect posts into a fence and hewed timber into a granary, without having done anything towards those objects more than to haul said posts and timber onto the farm, "is not sufficient to pass the property in said posts and timber."

In *Peck* v. *Batchelder*, 40 Vt. 233, the court gave effect to the obvious intention of the parties in deciding that certain property, viz., detached extra blinds and windows, did not pass with the sale of the house.

It was held in *Carkin* v. *Babbitt*, 58 N. H. 579, where the controversy arose between the owner and an attaching creditor, that lumber designed for the erection of a house was personalty. The facts in that case were very unlike those in the case at bar. The lumber was "neither in form nor position as it was designed to be permanently used." There was nothing "to distinguish it from ordinary lumber suitable for building purposes." Nor could the court apply in that case the principles applicable to a controversy between mortgagor and mortgagee.

I think, therefore, that the defendants were entitled to a verdict, and that the judgment should be reversed, with costs, and a new trial ordered.

GRANT and MONTGOMERY, JJ., concurred with CARPENTER, J.

MOORE, C. J. (*dissenting*). In 1886, Samuel E. Byrne, father of the plaintiff, was the owner of part of lots 4 and 5 of block 17 in Marquette, and commenced the erection of a building thereon. He had plans and specifications drawn, specifying each piece of structural iron to go into the building, with the size and length of each piece. He ordered a considerable quantity of structural iron, each piece of which was of the dimensions provided in his plans, and fitted for the place where it was to go. After commencing to lay the foundation, he brought some of the structual iron upon the premises and some on an adjoining lot, where it would be most convenient to put into the building. He also purchased some building stone, which was cut and dressed for the front of the building by the masons hired by him, some of which were on the premises and some on an adjoining lot. He continued the work of building until the following year. A considerable quantity of the structural iron was built into the structure and

some of the stone was used. After finishing the basement story, the work was suspended, but Mr. Byrne intended to go on with the work, and the iron and stone were left there for that purpose. Mr. Byrne gave Mr. Thurber a warranty deed of the premises April 20, 1887, and no work was done on the building after that time. The deed was intended to operate as a mortgage, and Byrne expected, notwithstanding the deed, to complete the building. Mr. Byrne had, in 1883, mortgaged the premises to one Michael Hagerty to secure the payment of $2,500, which remained unpaid. He also executed mortgages on the property—one to Campbell & Wilkinson, February 14, 1885, for $1,100, and one to James Dwyer, July 20, 1887, for $1,400. The Thurber title was sold on execution July 13, 1889, for $2,000. Henry C. Thurber, by warranty deed dated April 23, 1889, acknowledged February 4, 1890, conveyed the premises to Peter White for $4,000. After making this purchase from Thurber, Mr. White purchased all these other mortgages and the execution lien. The several deeds and mortgages above enumerated covered the real estate, and made no mention of building material. The structural iron and stone remained on the premises as they were left at the suspension of building operations. April 15, 1902, Mr. White, by warranty deed, conveyed the premises to the defendants. The deed, when first drawn, included the building material on the premises, for which this suit was brought, but at the request of the defendants it was stricken out of the deed, and a separate bill of sale was given for it. Defendants moved the material out of the way, and proceeded to put up a business building on the premises, using therein a small portion of the material involved in this suit, and disposing of the rest. Samuel E. Byrne executed a bill of sale of the said building material to the plaintiff May 20, 1896. The plaintiff brought an action of trover for this building material, and recovered judgment. A motion for a new trial was made, which was overruled. The case is brought here by writ of error.

In overruling the motion for a new trial the circuit judge filed a written statement, which states so admirably the questions involved, that we reproduce it here:

" 1. The first reason assigned for the motion is that the court erred in refusing to charge the jury as requested by defendants' counsel in the first request. This request related to the subject of fixtures, and was to the effect that the property which was the subject-matter of this suit passed by virtue of the deed from Samuel E. Byrne, Sr., to Thurber. This deed was in the usual form of a deed of lands. There was evidence tending to show that it was intended by the parties thereto to be a mortgage. But as the rule, when applied to mortgages, is no more favorable to the plaintiff than when applied to a deed, it is not very material here. I refused this request at the trial upon a somewhat hasty examination of such authorities as were at hand. A more careful examination of the authorities has confirmed my position at the trial. The evidence was undisputed that Samuel E. Byrne, Sr., had, as early as 1886 or 1887, commenced the erection of a building, and had purchased the structural iron and stone in question to go into the building, and that the same had been prepared for the building, and had been delivered upon or near the premises, with the intention to place the same in the structure. My recollection of the evidence is that work on the building had ceased for want of funds at the time of the deed to Thurber, but of this I am not positive. It certainly had ceased before the deed to White. These were articles to be annexed to the land.

" 'The question as to the necessity of actual annexation also arises as to articles which have not yet been annexed to the land, but have merely been brought on or near the land with the intention of annexing them. Such articles are, by the weight of authority, perhaps, to be considered as still personalty, though the contrary has quite frequently been decided.' 13 Am. & Eng. Enc. Law (2d Ed.), pp. 601, 602, and cases there cited.

" It seems to me that it cannot be said that this iron and stone formed or constituted a necessary accessory to the enjoyment of the land, which seems to be the rule laid down by some of the courts as the true test where annexation had not actually taken place. Much of the iron in question never went into the building since erected by defendants, but was exchanged for that more modern and suitable. The old rule

seems to have been that there must be physical annexation, but under some circumstances that rule has been relaxed where the article is shown to be a necessary accessory to the enjoyment of the land. The fact that a place was prepared in which to put an article does not necessarily make the article part of the realty. Id. 608, 610. Notwithstanding the language of our Supreme Court in the case of *Curtis* v. *Leasia*, 78 Mich., at page 483, I understand that in a case like the one under consideration the question may be said to be an open one in this State.

" Having ruled as I did upon the trial, and finding upon further examination no reason to change the ruling, I feel like adhering to the ruling, and must refuse a new trial upon this ground. Upon this subject I refer to the following case: The reasoning of Lowrie, C. J., speaking for the court, in *Johnson* v. *Mehaffey*, 43 Pa. St. 308, is very satisfactory. The action was replevin for two rolls' which had been cast for a certain rolling mill. The mill was sold to the plaintiff, who claimed the rolls. The rolls had been sold on execution as the personal property of the grantor. The rolls had been paid for and delivered at the mill, where they remained for about three years, in a rough and unfinished condition, without having been put into the mill. After stating these facts, the court said:

" 'These rolls were cast for this rolling mill, and paid for and delivered beside it, and lay there two or three years without being turned or finished off or put into the mill, and then the mill was sold by the sheriff. Do the rolls go with the mill to the purchaser? The test question is, Were they elementary parts of the mill at the time of the sale? And as matter of fact it is quite plain that they were not, for the mill had always run without them. No doubt they were intended to be made part of the mill, but we do not see how we can take the intention, without fact, in order to declare what constitutes the mill. If we do, then the sale of a half-built or half-ruined house would include all the materials provided for its completion or repair. A very provident man is quite sure to have on hand materials which he sees will some time be necessary for the repair of his works, or for supplying deficiencies in them; but his having them with this intention does not make them constituent parts of his works. Thus he will provide extra saws for a sawmill, or bolting cloth for a flourmill, or extra castings for the running gear, or lumber, nails, screws, and other materials, to make improvements or repairs; but this prudence does not convert personal into real property, so long as the fact remains that they are not yet made constituent elements of the mill or other structure. That

fact we can ascertain and define with reasonable certainty, but we can have no measure for the ever-varying degrees of prudent forethought. And if mere intention could affix such articles to the realty, then a mere change of intention would unfix them, or prevent their becoming affixed, and we should thus be without any rule at all to guide us. Besides, it is rather a contradiction in terms to say at the same time that they are parts of the structure, and are intended to be made so. That these rolls will fit no other mill does not make them part of this one, or prove them so. Furniture for a dwelling house, shelving and drawers for a store, boilers, and flywheel for an engine, the frame for an addition to a house, have often this very peculiarity, and great loss would arise if they should not be applied according to the intention with which they were made. Yet they cannot be a part of the real estate without a purpose of annexation actually effectuated, though this peculiarity of adaptation may, by inference or corroboration, supply the want or the weakness of direct evidence of annexation, whenever this fact can be reasonably said to be left in doubt by the other evidence.'

" 2. It will be borne in mind that defendants' requests upon the subject of abandonment were all given. The second reason for the motion is that the jury disregarded the clear weight of evidence and the charge of the court upon this subject. The jury were charged that abandonment is the relinquishment or surrender of rights or property by one person to another; that it includes both the intention to abandon and the external act by which the intention is carried into effect; that to constitute an abandonment there must be the concurrence of the intention to abandon and the actual relinquishment of the property, so that it may be appropriated by the next comer. In view of the fact that Samuel E. Byrne, Sr., had in 1896 made a bill of sale of this property to the plaintiff, and that both the plaintiff and his vendor testified that they never intended to abandon it, I cannot say that the verdict was against the clear weight of the evidence upon this subject.

" 3. Upon the question of adverse possession or the statute of limitations the jury were charged as requested by defendants' counsel. Now for the first time defendants' counsel take the position that 'the uncontradicted evidence of the case showed continued adverse possession of the property by the defendants and their grantor for more than six years prior to the beginning of the suit.' The evidence showed that the lot and real estate, with a par-

tially constructed wall, had been unoccupied for a long term of years before the defendants commenced the erec-·tion of their building in 1902. The premises near the sidewalk were in a somewhat dangerous condition, as they were upon a level with the walk, and Mr. White had placed guards there to prevent persons from going upon the wall, and a small candy store had stood there for a short time. I do not think that there was any evidence that Mr. White had done or performed any act that would indicate that he claimed to own the structural iron and ·stone that lay loosely scattered about upon and near the premises covered by his deed. In fact, all of his acts were more consistent with assertion of ownership of the real ·estate, than with an open, adverse claim of the ownership of this personal property, until he sold the same by bill of sale to the defendants in 1902. So I cannot agree with defendants' counsel that the verdict was even against the weight of the evidence upon this subject.

" 4. The court, upon its own motion, and without request from defendants' counsel, fully charged the jury upon the subject of estoppel. Defendants' counsel claim that the jury disregarded the evidence in the case and the charge of the court, and that defendants were entitled to a verdict upon that ground. In the light of the testimony of Samuel E. Byrne, Sr., it is not fair to say that the evidence upon the subject was undisputed. A question of fact was raised by the testimony of Mr. White and Mr. Byrne, which was for the jury to consider. Mr. White had testified to the representations claimed to have been made by Byrne that all of the material went with the premises, and that, relying upon that, he purchased from Mr. Thurber, in the spring of 1889, and that he and Thurber walked upon the premises, and that he then took possession of this personal property. It appeared by reference to the deed from Thurber that it was executed in Washington, D. C., some time after its date. There is no doubt that this fact may have influenced the jury. It was unexplained by Mr. White. It also appeared that at the time Mr. Byrne, Sr., had a talk with Mr. White about his getting a deed from Thurber, he, Byrne, contemplated finishing the building. Had the building been completed, this material would, in all probability, have gone into it, and the security or value of the property would have been increased. So there was some force in Mr. Byrne's claim in his testimony that, while he did refer to the material as

possessing a value, he did not say that it went with the land. I simply refer to this to show that there was here a question of fact for the jury, and that I cannot say, as matter of law, that the defendants were entitled to a ver-- dict upon the ground of an estoppel."

It is said the court erred in admitting the testimony of Byrne as to the gross cost of the structural iron. Mr. Byrne had testified that the structural iron cost him $62 a ton; that it had remained about the same price from then until now, and that he did not think over a fourth was affixed to the structure; that he was positive not more than a third was affixed. He was then asked for its gross purchase price, and the judge said that in connection with his other testimony, where he stated he thinks there has been no change, he would, for that reason only, per- mit the answer. We think this ruling was not error. See *Kendrick* v. *Beard*, 90 Mich. 589; *Johnston* v. *Insurance Co.*, 106 Mich. 96.

It is said the evidence did not warrant a verdict for the plaintiff, and the court erred in submitting the case to the jury.

1. Samuel E. Byrne, Sr., was estopped by his words and acts from claiming ownership of the materials as against Mr. White after his purchase from Thurber.

2. If the plaintiff, or his grantor, ever had any right of action, it was barred by lapse of time before this suit was commenced.

There is nothing in the record to show that the judge was requested to take the case from the jury. Upon the question of estoppel the jury were charged:

"I first call your attention to this question of estoppel that is claimed here by the defendants in this case. It seems that at one time this property had been deeded by Mr. Byrne, Sr., to Mr. Thurber, of this city, and subse- quently Mr. White obtained the interest that Mr. Thurber had by a deed of conveyance made in 1889, as I remember it. The claim of Mr. White here is that before he made the purchase from Mr. Thurber of the land or any of this property that he had certain conversations with Mr. Byrne,

Sr., at a time when Mr. Byrne had not yet parted with
this property by his bill of sale to his son, and the claim
of Mr. White is that at an interview had between him and
Mr. Byrne, at which Mr. Byrne desired him (White) to
obtain the interest of Mr. Thurber, that Mr. White ex-
pressed the belief that the property was not worth the
amount he would have to pay Mr. Thurber, together with
the mortgages that were upon the property—referring to
the Campbell & Wilkinson mortgage, the Dwyer mort-
gage, and the Hagerty mortgage; and Mr. White claims
before you in his testimony that Mr. Byrne said to him:
'There is a great deal there that you don't see, that you
don't count. There is material enough to almost finish
the building. It all goes with it.' And Mr. White claims
that in many talks had with Mr. Byrne before he (White)
became interested by purchasing from Mr. Thurber,
Mr. Byrne said to him that that property would all pass
if he dealt with Thurber, and belonged to the property, and
would go into and with the lot or building. Now, gentle-
men, the first question that arises, Was this statement
made by Mr. Byrne to Mr. White? While the court ad-
vises you that this personal property, consisting of this
structural iron and stone, would not pass by a deed of
the realty simply to Mr. Thurber, whether that was a
mortgage or a deed, it would not pass by virtue of the
instrument, it would have been perfectly competent
for Mr. Byrne by an oral arrangement—by a verbal
agreement—with Mr. Thurber at that time to have passed
over and conveyed to him this personal property. And
if, before Mr. White purchased this real estate of Thur-
ber, and took, as he claims, Mr. Thurber's interest in this
personal property—for I understand that it is claimed that
accompanying this transaction of the deed from Thurber
he took, by virtue of a verbal arrangement with Thurber,
the right to receive this personal property, and claims that
it was pointed out to him and delivered to him by Mr.
Thurber; and it is for you to weigh this evidence and
say whether Mr. White is correct or not; that being his
claim, I say, that if Mr. Byrne gave him to understand
by any conversations with him that Mr. Thurber owned
not only the real estate, but also owned the personal prop-
erty there; that it belonged to him, would pass to him
(White) if he dealt with Thurber—then Mr. Byrne is es-
topped, and his vendee, his son, is estopped, from claiming
any interest in this property. For a man cannot stand by,

or cannot induce another to purchase property in which he claims an interest, if he gives such purchaser to understand that he will get a good title if he deals with somebody else with reference to it.    He is estopped from asserting any such claim.    If you stand by while I am purchasing a horse of your neighbor, and say that your neighbor owns that horse, and, if I buy him, I will get a good title, and I purchase the horse and pay my money for it, you are estopped—your mouth is closed—from ever afterwards claiming that you owned the horse at that time; because you have by your conduct and language induced me to part with my money, and it is inequitable and unjust for you to make a claim inconsistent with that.    The doctrine is a familiar one in the books.    When a person by his words or conduct voluntarily causes another to believe in the existence of a certain state of things, and thereby induces him to act upon that belief, so as to change his previous condition, the person inducing such belief will be estopped from afterwards denying the existence of such a state of things to the prejudice of the person so acting. In other words, if a person knowingly and voluntarily so conducts himself in relation to his business as to justify persons dealing with him in supposing and believing that a certain state of facts exists, and such person so dealing with him relies upon that inference and belief, the person so conducting himself will not afterwards be permitted to deny that such state of facts did exist, to the prejudice of the person acting upon such belief.

"You will remember that in the conduct of the trial yesterday, and while Mr. White was upon the stand, the court asked him this question:

"'You may state whether the fact that Mr. Byrne, Sr., stated to you that this material was to go with the building, and the other conversations you have referred to, had any influence upon you in purchasing the property.'

"And you remember that Mr. White claimed and said in answer to that:

"'Most decidedly.    I wouldn't have touched it—I wouldn't have paid him $4,000—without the complete understanding that all the material there belonged to or went with the building.    Mr. Byrne's own argument was that it was ample to cover the $4,000.'

"I do not wish to emphasize this language by calling your attention to that; more than to call your attention

to the 'point involved. You will weigh the testimony of Mr. Byrne upon the opposite side of this question, in which he denies that he said to Mr. White that it would go with the building, or with the transaction or trade with Thurber. Now, who is right about this, gentlemen ? If you shall say that Mr. Byrne used this language, it having been perfectly competent and proper for Mr. Byrne to have conveyed this property by oral arrangement to Mr. Thurber, if you shall say that he did do that, or, even if he didn't do that at all, but gave Mr. White to understand by language that a reasonable man would believe and be induced to act upon, that he had so conveyed it over to him, by a verbal or other arrangement, so that if he (White) did deal with Thurber he obtained the interest in this personal property, then I say Mr. Byrne is estopped from claiming this property; and his son, who afterwards became the alleged owner of it by virtue of a bill of sale, could take no greater title than his father had; and, if his father had parted with his title to that property, then he could convey no interest in it. So much for this doctrine or claim of estoppel on the part of the defendants."

Mr. Byrne denied most emphatically Mr. White's testimony as to Byrne's telling him the title to the iron and stone passed to Thurber by the deed.

In *Maxwell* v. *Bridge Co.*, 41 Mich. 453, the court said:

"The doctrine of estoppel rests upon a party having directly or indirectly made assertions, promises, or assurances upon which another has acted under such circumstances that he would be seriously prejudiced if the assertions were suffered to be disproved or the promises or assurances to be withdrawn. But as the doctrine, when applied, operates to take away legal rights, it is no more than common justice to require that the facts which are supposed to call for its application shall be unquestionable, and the wrong which is to be prevented shall be undoubted. *Fredenburg* v. *Lyon Lake Church*, 37 Mich. 476; *Cronin* v. *Gore*, 38 Mich. 381. Moreover, the question of its application in any case is a mixed question of law and fact, and in cases of jury trial must be submitted to the jury under proper instructions. Now, however clear the facts in support of the estoppel may seem to be, it is always possible that there may be qualifying or overruling

facts; and the conclusions from the evidence must be drawn by the jury, not by the court."

In relation to the claim of plaintiff being barred by lapse of time, we think it sufficient to refer to what was said by the learned trial judge in overruling the motion for a new trial.

We now come to the most difficult question in the case; that is, whether, as claimed by defendants, the court erred in the instruction given to the jury that the structural iron and stone did not become a part of the realty, and refusing the request of defendants' counsel on that subject. It must be confessed there is a good deal of conflict in the authorities. They are collated at length in 13 Am. & Eng. Enc. Law (2d Ed.), at pages 601 to 610, and in the notes thereto. We are impressed with the reasoning of Chief Justice Lowrie in *Johnson* v. *Mehaffey*, 43 Pa. St. 308, from whose opinion Judge Stone quoted so copiously. There is an expression used in *Curtis* v. *Leasia*, 78 Mich. 483, by Justice SHERWOOD, that tends to support the claim of defendants, but it is obiter dictum. The court held in the case that the rails which were claimed to be realty were not realty, but were personal property. See *Harris* v. *Scovel*, 85 Mich. 32. In this case it appears the defendants made new plans for a building, which rendered the structural iron and dressed stone unfitted for use therein. Was this material up to that time real estate, and from that time on personal property? If so, would the same result have followed had Mr. Byrne changed the plan of the building while he owned the property?

We are inclined to agree with the trial judge as to the weight of authority, and that the judgment should be affirmed.

HOOKER, J., concurred with MOORE, C. J.