## In re RUSSELL FALLS CO.

## In re WORCESTER TRUST CO.

(District Court, D. Massachusetts. March 23, 1918.)

No. 25278.

1. BANKRUPTCY ⊚⟹143(5)—TRUSTEE—RIGHTS OF.

Relative to whether real estate mortgage covered machines on the mortgaged premises, trustee of the bankrupt mortgagor stands. in no better position than the mortgagor.

2. FIXTURES ⊚⟹18(1)—MORTGAGOR AND MORTGAGEE—POLICY OF LAW.

As between mortgagor and mortgagee, the law favors the mortgagee, when the latter claims that personal property on the mortgaged premises has become a fixture, so as ·to pass with the land.

3. CORPORATIONS ⊚⟹478—CONVEYANCES—MORTGAGES—EFFECT.

Where, when a corporation executed a mortgage to secure its bonds, it did not own a factory site, but the site was thereafter conveyed to it, and by it conveyed to the mortgagee, the conveyances must be deemed to have included whatever had been and was subsequently annexed to the realty.

4. FIXTURES ⊚⟹1—PERSONALTY—"INTENT."

Whether personal property, such as machinery, has become part of the realty depends, first, upon whether it has been annexed thereto, and, secondly, on the intent with which it was attached; intent in such cases being the intention manifested by all the facts and circumstances which tend to show the purpose, whether temporary or permanent, of the annexation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Intent.]

5. FIXTURES ⊚⟹35(2)—EVIDENCE—ADMISSIBILITY.

Provision in a real estate mortgage that after-acquired property, real and personal, should be subject to it is evidence of intention of the parties, and admissible to rebut the contention of the mortgagor that machinery annexed to the mortgaged premises did not pass as part of the land.

6. FIXTURES ⊚⟹18(5)—EVIDENCE.

That machinery annexed to land by mortgagor was bought on conditional sales, and that for a portion of the time the mortgagor had only a leasehold interest in the land, is not conclusive against the contention of the mortgagee, the mortgagor later having acquired the fee, that such machinery passed as part of the land, being a fixture.

7. CHATTEL MORTGAGES ⊚⟹17—TITLE OF MORTGAGOR—CONDITIONAL SALES.

A purchaser of machinery on conditional sale acquires an interest, which he can mortgage, regardless of the effect as between him and the seller, or as between the seller and a mortgagee with notice, of restrictions against incumbrances.

---

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. FIXTURES ⟪1—REMOVABILITY—INJURY.

While the fact that machinery annexed to the freehold could not be removed without great injury to itself, or to the property, would go far to show that it had become a fixture, the fact that it could be removed without material injury to itself or the property has little tendency to show that it had not become part of the land.

9. FIXTURES ⟪18(5)—ANNEXATION—UNCOMPLETED MACHINES PARTLY ANNEXED.

Where a mortgagor engaged in the paper-making business installed large and heavy machinery in its plant, and part of such machinery was placed on specially prepared foundations, and other portions securely bolted to the floors, the machinery must be deemed to have become part of the land, even though it was purchased under conditional contracts, and the mortgagor did not, at the time of the installation of the machinery, have more than a leasehold interest in the land; it later having acquired the fee.

10. BANKRUPTCY ⟪143(5)—MORTGAGED PROPERTY — MACHINERY — ANNEXATION.

Where a large, heavy paper-making machine was partially installed, being placed on specially prepared foundations and securely bolted and fastened thereto, and the remaining parts were in the mill, the entire machine, though installation was stopped by the bankruptcy of the owner, should be deemed affixed to the land, so as to pass under a real estate mortgage as fixture; this being particularly true, as the machine itself, though complete to begin with, had been changed to suit the location.

11. BANKRUPTCY ⟪474—CHARGES—PERSONS LIABLE.

Bankruptcy Act July 1, 1898, c. 541, § 48, 30 Stat. 557 (Comp. St. 1916, § 9632), relating to the compensation of trustees, receivers, and marshals, furnishes no ground for holding mortgagee liable for any portion of the fees, charges of the bankruptcy court, though the mortgagee asserted in that tribunal its right to property covered by the mortgage, which was also claimed by the trustees.

In Bankruptcy. In the matter of the Russell Falls Company, bankrupt. Certain property and the proceeds thereof was claimed by the Worcester Trust Company, which claim was opposed by the trustee. On certificate of the referee. Judgment for claimant.

Arthur T. Johnson, of Boston, Mass., for trustee.

Peabody, Arnold, Batchelder & Luther, of Boston, Mass. (Edmund K. Arnold, of Boston, Mass., of counsel), for Worcester Trust Co.

MORTON, District Judge. This case comes here on a certificate from Referee Darling. Accompanying the certificate is a report of the evidence with the exhibits that were introduced. The parties are the trustee in bankruptcy and the Worcester Trust Company, trustee under a mortgage executed to it November 1, 1907, by the Russell Falls Paper Company, the predecessor of the bankrupt corporation, to secure bonds issued by the paper company to the amount of $250,-000. The Russell Falls Paper Company, hereinafter called the old company, was organized September 27, 1907, by one Maynard and others under the laws of Maine, for the purpose of engaging in the business of manufacturing paper. The business proved unprofitable, and as a result there was, in 1913, a large indebtedness in addition to the bonded indebtedness. Early in 1915, the Russell Falls Company,

the bankrupt corporation, hereinafter called the new company, was organized under the laws of Massachusetts, for the purpose of taking over the property, assets, obligations, and business of the old company. It was thought, or hoped, that the difficulties in which the old company found itself involved might be met by the sale of stock in the new company. An agreement was entered into between the two companies which provided that the property transferred from the old to the new should be "subject to all claims, liens, or incumbrances upon the property transferred, assigned, or conveyed, * * * and to a certain mortgage of property of the Russell Falls Paper Company executed for the protection of bondholders to the Worcester Trust Company on November 1, 1907, * * * and to such pledges, contracts, and obligations as are now outstanding whether herein enumerated and specifically referred to or not." The new company, though an independent organization, appears to have been, in substance and effect, a continuation of the old company. So far as the evidence goes, there does not seem to have been any formal transfer or conveyance by the old company to the new; there is no such deed among the exhibits. In August, 1915, the directors of the new company voted that it was inexpedient to put up the $35,500 required to keep the mill going, and arranged for the filing by certain creditors of a petition in bankruptcy against the company, which was done, and the company was duly adjudicated bankrupt.

The principal question is whether certain machinery in the mill and on the premises at the time of the filing of the petition in bankruptcy was subject to the mortgage. There is a subsidiary question as to whether the trust company is liable for the fees, cost, and charges of this court, or any part thereof. Under an order of this court, the machinery has been sold free from all liens, and the proceeds, amounting to $70,000, paid into court to await the determination of the matters at issue. The parties came to what was, in effect, an understanding as to the values to be placed on the various items, or units, of which the machinery was composed, and the referee has found the values, substantially, if not entirely, in accordance therewith, item by item. The question of values, which otherwise might have been a troublesome one, has thus been eliminated. No question is or has been raised as to the validity of the mortgage. The case was heard at length by the referee, and in addition he took a view.

The referee has divided the property as to which there is or might be controversy into three groups. As a matter of classification, the parties are content with the grouping, though the trust company objects to the conclusion to which the referee has come in regard to the item contained in the second group, and the trustee in bankruptcy to the conclusions to which he has come in regard to items contained in the first group. The third group consists of articles which the referee has classed as personal property, and which he finds the trustee in bankruptcy is entitled to. The trust company makes no claim to any of these articles, and they need not, therefore, be further considered. The first group consists of machinery to which the referee has found the trust company entitled under its mortgage. The second

group consists of what is called the second paper machine, to which the referee has found the trust company is not entitled, and the trustee in bankruptcy is entitled.

[1-3] The case is one wholly between the mortgagor (represented by the trustee in bankruptcy, who, I think, stands in no better position than the mortgagor) and the mortgagee, the Worcester Trust Company; and as between mortgagor and mortgagee, for reasons stated by Shaw, C. J., in Winslow v. Insurance Co., 4 Metc. 306, 38 Am. Dec. 368, the law favors the mortgagee. See, also, Bartholomew v. Hamilton et al., 105 Mass. 239; Southbridge Savings Bank v. Mason, 147 Mass. 500, 18 N. E. 406, 1 L. R. A. 350. When the mortgage was executed, the old company did not own the factory site, nor, with perhaps some trifling exceptions, the machinery. The land belonged to the Boston & Albany Railroad Company, subject to a lease for 21 years held by the Otis Fiber Board Company, with a provision in it that buildings and structures could be removed by the lessee before the end of the term. This leasehold interest, with other property, had been bid off in the interest of the old company, at a foreclosure sale of the property of the fiber company, and was later conveyed to the old company, and by that company to the trust company. Subsequently the railroad company deeded the land in fee to the old company, which conveyed it to the trust company. The conveyance was in 1911 or 1912, and must be held as matter of law, it seems to me, to have included whatever had been and was subsequently annexed to the realty, so as to constitute a part thereof, whether specifically enumerated in the instruments of conveyance or not, unless expressly excepted, which was not done.

The machinery was bought largely on conditional sales, which provided that no title should pass until it was paid for, and, in some cases, that it should not be transferred or mortgaged. The referee has found that the machinery had been paid for, and that the title had vested before the petition in bankruptcy was filed. This finding is not controverted. It is urged that some of the payments were made by the new company, and some of the machinery was put in by it. There is no finding in regard to these matters. But, even if it was as urged, the title of the mortgagee would not be affected thereby. It is immaterial, so far as the trust company is concerned, whether the old company put in all of the machinery or not, if by whomsoever put in it was annexed to and constituted a part of the realty. It is also immaterial, for the same reason, who paid for it. Such matters might have some bearing on the question of the intent with which the machinery was annexed to the freehold, but that would be all.

[4] Whether property which would otherwise be personalty (in this case the machinery in question) has become a part of the realty, depends, first, upon whether it has been attached or annexed to the realty, and, secondly, on the intent with which it was so attached or annexed. The intent in cases like this is the controlling factor. By intent is meant not the secret and undisclosed intent of the actor (Hopewell Mills v. Taunton Savings Bank, 150 Mass. 519, 522, 23 N. E. 327, 6 L. R. A. 249, 15 Am. St. Rep. 235), but the intention as

manifested by all the facts and circumstances which tend to show the purpose, whether temporary or permanent, of annexation, the object to be accomplished, the adaptation to such object, the degree and mode of annexation, and whatever else may tend to show what the party or parties annexing the machinery had in mind in regard to its relation to the realty. In the present case the referee has found, in effect, as I construe his finding, that it was the intention of the mortgagor, the old company (meaning, as I understand him, intention in the above sense), which intention he imputes, and I think rightly, to the new company, in placing the machinery in position, that it should be annexed to and constitute a part of the realty.

[5-9] There was abundant evidence, I think, to warrant this finding. In addition to the nature of the business, which manifestly contemplated the permanent annexation of the machinery to the land and buildings, the mortgage provides that after-acquired property, real and personal, should be subject to it, and also contains covenants for the future conveyance of the same to the trust company. This provision and these covenants did not, of themselves, as both parties agree, subject the after-acquired property to the mortgage; but they were evidence of a general purpose on the part of the mortgagor, with which the claim that is now made, that the machinery should be regarded as personal property, would be inconsistent. The fact that a large portion of the machinery was bought on conditional sales, of which the mortgagee had or may have had notice, and that the old company had for a portion of the time only a leasehold interest in the land, were circumstances to be taken into account, but were not decisive as matter of law on the question of intent. A purchaser of machinery on conditional sale may well believe that he will be able to pay for it and treat it as if he were in fact the owner. It is plain that he has an interest that he can mortgage, whatever the effect of that may be as between him and the vendor, or between the vendor and a mortgagee with notice. Dame v. Hanson, 212 Mass. 124, 98 N. E. 589, 40 L. R. A. (N. S.) 873, Ann. Cas. 1913C, 329.

This case, as already observed, is wholly one between the mortgagor and the mortgagee. It would be giving too narrow a construction to the conveyances that were made by the old company to the trust company to say that because they did not specifically mention the machinery, an intention was thereby manifested to except the machinery and to treat it as personal property. The conveyances included, as already observed, whatever had been annexed to and constituted a part of the realty, unless expressly excepted, and operated to give title to the trust company to whatever thereafter was annexed to and became a part of the realty. Bills of sale of the machinery to the trust company might have been given, as it was voted to do, for the purposes of security; but they became unnecessary by reason of the annexation of the machinery to the realty with the intention thereby to subject it to the mortgage. The same object which would have been accomplished by the bills of sale was effected by annexing the machinery to the realty, with the intention of thereby subjecting it to the mortgage.

No rule has been or can be laid down as to the degree or mode of annexation required, or the sufficiency of that which exists in any given case. Each case depends on its own facts. The certificate contains no findings as to the degree or mode of annexation of the different machines, or their adaptation to the end to be accomplished, or the use for which they were intended, except so far as may be inferred from the names given to them. The referee has rested the case on his finding in regard to the matter of intention. But, as already observed, the evidence and exhibits are before the court, and the character, use, adaptation, and mode and degree of annexation appear therefrom. I do not think it necessary to take up the machines one by one and go into them in detail. The machinery was bought for the mill which Maynard and his associates were constructing, and was intended for permanent use as a part thereof in the process of paper making. It . was such machinery as was required for the equipment of the mill. Much of it was large ·and heavy. Some of the machines were upwards of 125 tons in weight and 100 feet in length, and were placed upon foundations specially prepared for them from plans furnished by the vendors, and were secured by bolts bedded in concrete. Such of the machines as did not rest upon foundations specially prepared were fastened by bolts, or in some other manner, to the wooden flooring, or to the beams and timbers of the mill. The various machines were placed in the positions designed for them in the construction of the mill, and were not intended for removal. They were connected by pipes, belts, wiring, and gearing with the motive power, whether steam, water, or electricity.

The whole arrangement contemplated a permanent addition to the property for use in the business that was to be carried on there. The referee has found that the identity was not lost by reason of annexation to the realty, and that the machinery could be removed, as was being done with some of it, without material injury to itself or the buildings. But while the fact, if it had been the fact, that the machinery had lost its identity, or could not be removed without great or irreparable injury to itself or the property, would go far to show almost, if not quite, conclusively that it had become a part of the realty, the contrary fact, which is strongly relied on by the trustee in bankruptcy, that it could be removed without material injury to itself or the property has very little, if any, tendency to show that it was not so annexed to the realty, and with such intention, as to constitute it a part thereof. It seems to me that the conclusion to which the learned referee has come in regard to the machinery which constitutes the first group is correct and should be sustained. Perhaps as open to question as any of the items in this group are the electric motors, which are compact, self-contained pieces of mechanism, readily removable. Considering, however, their intimate connection with the machinery which clearly passed to the mortgagee, they seem to me to go with it is a necessary part thereof, just as the shafting and belts transmitting power from a central steam plant to a machine, which passed, would also pass.

[10] There is more doubt, I think, concerning the correctness of the referee's conclusion in regard to the second paper machine, which

constitutes the second group. He finds that it was never more than half installed, "that no driving mechanism has been provided, it being the purpose to supply it with the mechanism of the first paper machine," "that it never became a part of the paper-making process of the mill," and that "the wet end of the machine" (which it should be remarked was an important part of it) "was never set up in any of its parts." He also finds that it was bought by the old company on conditional sales, that "it was in a measure rebuilt for this mill, and the foundation for it was prepared from plans furnished by the vendor," and that the final payment was made by the bankrupt company. This is the substance of his findings. It appears from the evidence that the machine weighed from 125 to 150 tons and was of great length. It was not completed, but all the parts necessary for its completion had been delivered at the factory and were in the mill near at hand. Men were at work setting it up on the foundations prepared for it when the petition in bankruptcy was filed. As far as it was set up, it was permanently bolted and secured to the foundation, and at the wet end of the machine in the floor was a vat with a drainage pipe to receive and carry off the water from the machine.

So far as the reported evidence shows, the only persons who testified in regard to the condition of the machine were Mr. Barton, Mr. Eastman, Mr. Maynard, and Mr. Mills. There were also exhibits. It is not quite clear whether Mr. Barton was testifying in regard to the wet end of the machine, or to the machine as a whole. What he said was as follows:

"Q. That (referring to the second machine as compared to the first machine) is a wider machine? A. Yes. Q. But that machine has the wetting end, the same as the other machine? A. I assume so; it wasn't set up. Q. That is, not as yet set up? A. No sir. Q. No part of it? A. Part of it is set up; the greater part not."

It would seem that what the witness was referring to here was the wet end, and that a part of that had been set up, notwithstanding the referee's finding to the contrary. Later, in speaking of some changes which they (his firm) were making for the Westfield River Paper Company, he said that they would amount to about half of the machine; but that had no reference to the condition of the machine at the time to which he was testifying in the evidence already quoted. Mr. Eastman testified on direct examination as follows:

"Q. Mr. Eastman, how much of the second machine is set up, or was set up prior to the time of the Westfield River Paper Company's removal? A. All the machine proper was set up, with the exception of the flow box; the apron, and the wire, with the roll which runs the wire. Q. That is, there are a large number of rolls, as I understand it, in the wet part? A. Yes. Q. That were not in place? A. The wire I should have left out, because the wire is a part of the machine proper. Q. The wire and the flow boxes were in there? A. Yes, sir. Q. Then what was set up was the frame of the wet part? A. Yes, sir; and some of the rolls. Q. And some of the rolls? A. Yes, sir. Q. And what else was set up? A. All of the press rolls, all of the drying rolls, the calenders. There was lacking in the drying system four or five wooden rolls for the felts. Q. There was testimony by Mr. Barton about table rolls. Is that it? A. Yes; table rolls or tube rolls. Q. Where were they? A. They were in the mill. Q. Whereabouts? A. In a box about five feet from the end of the machine."

On cross-examination, his testimony was to the same effect.

Mr. Maynard testified, on direct examination, that "the entire machine was completed from the wet end to the winding part" when it was shipped to them (the old company); "the whole of it was complete, but we decided to throw out certain things and make certain changes," and it was "not completely set up." On cross-examination he said that the machine, as far as it went, was completely installed and attached to the foundation in the same way it would be if the entire machine had been installed; that it lacked "the drive, the wet end and the winding end." In answer to the question, "The substantial part of the machine is there, as shown by the picture?" (referring to one of the exhibits), he said, "The heaviest part of the machine is installed," by which I understand him to have meant the largest part. The testimony of Mr. Mills was that his firm sold the machine to the company, that it was complete when sold to them, that they had it changed over, that it had never been erected, that part of it, the driers, nothing but the driers as he noticed, were standing on the foundation, and that those were the only thing that attracted his attention, "because I [he] wasn't really interested in it." The exhibits show a large and heavy machine, several feet wide and high, and many feet long, with rolls of wood and iron and numerous other parts. It stands on steel or iron plates fastened to the foundation. It is built, in part at least, in sections; each section consisting of two heavy upright frames on opposite sides, bolted together at the top across the machine, and fastened on each side at their bases through the steel plates to the concrete foundation. The machine can be taken down section by section, but the sections are of no use independently of each other, and when the machine is completed it is run as a unit.

The result of this examination is, briefly, to show, I think, that a substantial part, if not the larger part, of the machine had been set permanently in position on foundations especially prepared for it, and securely bolted and fastened thereto; that the remaining parts were in the mill and near at hand, and the work of setting up and completing the machine was in progress; that the machine itself, though complete to begin with, had been changed over by throwing out some parts and putting in others, so as to conform to what was wanted at that particular mill, and that the part annexed would be useless without the rest of the machine.

As already observed, no rule has been or can be laid down as to the degree or mode of annexation required or the sufficiency of the annexation in any particular case. Something in the nature of attachment or annexation there must be. Mere intention that a machine shall be considered a part of the realty is not enough. I doubt whether the mere fact that a foundation has been prepared for a machine is sufficient in and of itself to constitute the machine a part of the freehold, although it seems to have been so held in McFadden v. Crawford, 36 W. Va. 671, 15 S. E. 408, 32 Am. St. Rep. 894. But where, as here, a substantial part, if not the larger part of the machine, has been permanently set up, on foundations specially pre-

pared for it from plans by the vendors, in the place in the mill intended for it, and firmly fastened to such foundations with the intent that it shall remain where it is placed as a part of the equipment of the mill, and where the work of completing the setting up of the machine is going on at the time of the filing of the petition in bankruptcy and has not been abandoned, and the parts necessary to complete the machine are at hand, and the machine is, for manufacturing purposes, a unit, and the parts set up and annexed will be of no use without the other parts, it seems to me that the more reasonable view is that the machine should be regarded as having been so far annexed to the realty as to constitute a part thereof. Certainly nothing more could have been done than was done to annex to and make a part of the realty so much of the machine as had been set up, and that would have to be taken down and disconnected in order to restore it completely to its former condition as personalty. I do not think that it is necessary that a machine should be put into operation before it can be considered a part of the realty, and I know of no such rule. If the machine is a unit, it would seem as though the annexation of a substantial part of it should be sufficient. It is not necessary that all the parts of a machine should be connected to it in order to pass with it is a fixture. In Hopewell Mills v. Taunton Savings Bank, supra, the loom beams were not fastened to the looms, but were held to be "no less real estate than those parts of the looms which were annexed to the realty." So shutters and blinds and keys, and presumably screens and storm doors and windows, pass as a part of the realty, though disconnected at the time of the conveyance. In the analogous case of materials which are on the premises to be used in the construction of an unfinished building, it has been held that they pass under a deed conveying the land and buildings. Rahm v. Domayer, 137 Iowa, 18, 114 N. W. 546, 15 L. R. A. (N. S.) 727. See, also, Dudley v. Hurst, 67 Md. 44, 8 Atl. 901, 1 Am. St. Rep. 368; Byrne v. Werner, 138 Mich. 328, 101 N. W. 555, 69 L. R. A. 900, 110 Am. St. Rep. 315; Hackett v. Amsden, 57 Vt. 432; McLaughlin v. Johnson, 46 Ill. 163.

In view of these decisions, it must be held, it seems to me, that as between mortgagor and mortgagee, if a substantial and unseparable part of a machine in process of erection has been permanently annexed to the freehold, with the intention of making the machine a part of the realty, then the machine, taken as a whole, must be regarded as a fixture, and work done upon it in completing it must be regarded as work done upon it as a part of the realty. Though the question is not free from doubt, I incline to the view that the second paper machine was so far annexed to the realty as to come under the mortgage as a fixture.

[11] As to the remaining question, concerning the trust company's liability for the fees, costs, and charges of this court, I think the ruling of the referee was correct. The trust company had a choice of remedies. It elected, and very properly, I think, to present its case as a part of the proceedings in the bankruptcy court. It should not be compelled to pay a part of the fees, costs, and charges of that court, unless clearly required to do so. I do not think that section 48 of

the Bankruptcy Act, relied on by the trustee, imposes such a liability. And in Re Williams' Estate, 156 Fed. 934, 84 C. C. A. 434, it was held that the mortgagee was not liable to such fees, costs and charges.

The result is that of the $70,000 the trust company is entitled to the sum of the values of the items contained in the first and second groups in the referee's certificate, amounting in the aggregate to $65,300, with interest on the same at the rate, if any, received while the fund has been in the possession of the court.

So ordered.